## Cunningham's Estate.

108

Argued October 6, 1937. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Ella Graubart,* with her *Patterson, Crawford, Arensberg & Dunn,* for appellant.

*John G. Buchanan,* of *Smith, Buchanan, Scott & Ingersoll,* with him *John T. Duff, Jr.,* and *Emory R. Kyle,* for appellee.

OPINION BY MR. JUSTICE MAXEY, November 23, 1937:

The question presented to us by this record is: Did the trustee bind itself to account in full for the principal amount of cash and securities originally deposited with it? The accounting trustee, Peoples-Pittsburgh Trust Company, as successor to Dollar Savings and Trust Company, in August, 1926, was in possession of trust funds for the beneficiary, Cunningham. From these funds it then purchased for his account three mortgage bonds of the Doubleday-Hill Electric Company, aggregating $3,000. It appears that the trustee was likewise trustee under the indenture securing these bonds and was thus fully acquainted with the circumstances of their issuance and the condition of the corporate mort-

gagor. Apparently a balance of cash due Cunningham of approximately $870.79 remained in its hands. On May 3, 1927, it entered into a trust agreement with Cunningham, recited below.* In referring to the subject of

---

\* The agreement reads as follows:

"WHEREAS, the said George S. Cunningham, party of the first part, has deposited with the said Dollar Savings and Trust Company, party of the second part, sundry moneys and securities, aggregating $3,870.79 of which $3,000 is represented by Three $1,000 bonds of Doubleday-Hill Electric Company and $870.79 in cash, and,

"WHEREAS, There will be added to said account moneys, from time to time, at the rate of $66.67 per month from the Board of Foreign Missions of the Presbyterian Church in the United States of America, and also the incomes from said above mentioned bonds and from the cash moneys invested by said Dollar Savings and Trust Company, and,

"WHEREAS, Said fund, with accumulations, is known as 'CHILDREN'S ALLOWANCE,' and is intended to be used by the said George S. Cunningham for the benefit, maintenance and education of his children, namely Martha Francis Cunningham, Thomas Davis Cunningham and Andrew Dent Cunningham.

"NOW THEN THIS AGREEMENT WITNESSETH: that the said George S. Cunningham, party of the first part, hereby authorizes the said Dollar Savings and Trust Company to invest said moneys in such safe investments as it may see fit and to reinvest the accumulated income therefrom as heretofore provided, unless the said first party shall hereafter direct some other disposition of the income.

"That the said party of the second part, in consideration of the terms of the guarantee hereinafter mentioned, guarantees to the said party of the first part, as follows:

"First: Payment of the principal sum within three (3) months after the same has been demanded by the said party of the first part.

"Second: Payment of the income on said principal sum at the rate of five (5%) per centum per annum, payable semiannually at January first and July first respectively.

"By the acceptance of this guarantee the said party of the second part is hereby irrevocably made the agent of the party of the first part, to invest and reinvest the said principal sum in such investments as are prescribed under the Statutes of the Commonwealth of Pennsylvania, for the investment of 'Trust Funds' and shall re-

the trust, the agreement uses the words: "sundry moneys and securities, aggregating $3,870.79 of which $3,000 is represented by" the three bonds and $870.79 in cash. It then refers to other moneys to be added to the trust from time to time, including the income from the bonds and from investments made of the cash received by the trustee, and authorizes the trustee to invest "said moneys in such safe investments as it may see fit and to reinvest the accumulated income therefrom." Obviously the first clause giving authority to invest is one of accumulation and means that upon receipt of all income the same is to be invested, unless the settlor directs otherwise.

In the ensuing paragraphs the agreement for the first time uses the words "principal sum," and it is upon the meaning of this phrase that this dispute hinges. It is the settlor's contention, sustained by the court below, that this expression refers to the principal amount of the bonds and cash originally deposited, together with all accretions of income therefrom accumulated and reinvested, and that by the agreement the trustee undertook to repay the full amount thereof in cash three months after demand by the settlor. The trustee insists that "principal sum" refers only to the cash and accumulated income, as invested and reinvested, and hence that it is not required to pay in cash the principal amount of the bonds, which subsequently were defaulted.

Returning to the terms of the agreement itself, we find that the trustee "guarantees" to Cunningham, first, "payment of the principal sum" three months after demand, and, second, "payment of the income on said prin-

---

ceive as its compensation for the same, the excess income over the guaranteed rate above.

"It is further agreed that said second party may cancel this agreement at any time by previously giving three (3) months' notice to the said party of the first part of its intention so to do, interest at the rate specified to be paid in full to the date of cancellation."

cipal sum at the rate of five (5%) per centum per annum," payable semiannually. The agreement then provides that the trustee is made the agent of the settlor "to invest and reinvest the said principal sum" in legal investments for trust funds, and "shall receive as its compensation for the same, the excess income over the guaranteed rate above." The final paragraph permits cancellation by the trustee on three months' notice to the settlor, "interest at the rate specified to be paid in full to the date of cancellation."

We find nothing in the agreement which indicates that the parties, in using the words "principal sum," intended to refer to anything but the aggregate amount of both bonds and cash originally deposited with the trustee, inclusively treated as cash, referred to at the beginning of the agreement as "sundry moneys and securities, *aggregating* $3,870.79 of which $3,000 is *represented* by bonds" and the balance by cash. Such is unquestionably the usual and natural acceptation of the term, whether referring to bonds alone or the cash deposited or both. When it is considered that the bonds were by far the major portion of the trust *res* deposited, one is the more strongly persuaded that they were comprehended within the designation of "principal sum."

Moreover, two clauses in the agreement confer upon the trustee the power to invest and reinvest. The first plainly refers only to cash deposited and cash accumulated from income on the whole trust estate. The second, wherein the phrase in question, "principal sum," is employed, would be practically useless repetition if "principal sum" does not refer to the whole corpus involved, including the bonds. The only proper significance to be attached to the use of these words in the second empowering clause is that by it the parties intended to embrace the whole corpus. If so, the guarantee must likewise have been of the payment of the whole corpus.

It is worthy of note, moreover, that the agreement contains no specific provision for disposition of the bonds or their proceeds, upon termination of the agreement on three months' notice. The trustee guarantees the "payment of the principal sum," but undertakes nothing with reference to the bonds, unless the principal amount thereof was meant to be included within the sum payable. It cannot be lightly assumed that a trust agreement of this character was so carelessly drawn as to omit altogether any provision with respect to the bonds; the presumption must be to the contrary, and that the words of general import covered all the items comprising the trust.

A further consideration is the clause providing for the trustee's compensation—"the excess income over the guaranteed rate" of five per cent on "the income on said principal sum." If "principal sum" means the cash and accretions alone, the trustee was to receive no part of the income from the bonds. It would be unreasonable to believe that the trustee agreed to be satisfied with the excess earnings over five per cent on the *cash invested* alone, as the price for its administration of the trust, when the *bonds constituted the chief asset* of that trust. It might be that little if any cash would come into the estate during its ensuing administration, to be invested and produce income in excess of five per cent and thus provide commissions for the trustee. We think the more reasonable interpretation is that the trustee should receive for its services the excess over five per cent received as income on the whole corpus, including the bonds. The mere fact that the bonds earned $6\frac{1}{4}$ per cent yearly is of no significance one way or the other. It happened that the interest rate on that investment was fixed, but of course it was not fixed as to the cash as yet uninvested. The trustee intended to earn on that as much as it could, and keep for itself all income over five per cent. It promptly invested all cash received, knowing that idle money is unremunerative. The rein-

vestment of the cash received from time to time was necessary to maintain that adequacy of income on which its remuneration depended.

In fact, this was at first the trustee's own interpretation, as disclosed by a statement which it sent the settlor, Cunningham, showing the condition of the trust estate for the period from May 3, 1927, to July 1, 1928. In this statement at each semiannual period the trustee charged itself with five per cent interest on the whole corpus, including the bonds, irrespective of the amount of income actually received from the investments made or existing. These interest payments were successively added to the entire corpus to form a new balance on which interest at five per cent was allowed at the next interest period, the interest thus being compounded. No mention is made in this statement of what income the bonds actually produced. It was shown, however, that they paid the full rate of $6\frac{1}{4}$ per cent, and the balance in excess of five per cent was retained by the trustee as commissions. Such a treatment of the account could obviously accord only with the construction which the settlor contends for. It is significant that when the next statement was rendered, a change of great importance to the trustee had occurred, to wit, the bonds were about to be defaulted, reorganization of the mortgagor was imminent, and no interest on the bonds was paid after March 31, 1931. The statement is for the period from July 1, 1928, to July 16, 1931. The trustee, as mortgagee of the bond issue, was doubtless aware of the unsatisfactory financial condition of the mortgagor. Clearly, if the theory on which the trustee drew up the first statement, were followed in the second, interest credits would have to be allowed the settlor at the rate of five per cent on the portion of the *corpus comprised by the bonds, as well as on the rest,* even though current income from the bonds had wholly ceased or was likely to. Taking the position that the "principal sum" on which it was obligated to pay five per cent did not include the

bonds, the trustee prepared a statement allowing the settlor the entire 6¼ per cent received in semiannual installments on the bonds, and five per cent on the other investments. This was obviously to the trustee's advantage as the economic situation then stood, and the trustee sought thereby to establish an interpretation by practice between the parties which would benefit it if the income on the Doubleday-Hill Company bonds faltered or failed as they did shortly afterwards.

As we view the agreement, the interpretation adopted by the trustee in its first statement of account was correct, and we construe the trustee's undertaking as an obligation to pay to the settlor, upon termination of the trust, the principal amount in cash of the entire corpus invested pursuant to the terms of the trust. In agreeing to pay the "principal sum," the trustee engaged to pay the aggregate principal received at the inception of the trust in the form of cash and bonds, plus whatever cash income should thereafter be received and become principal by reinvestment. That payment of principal in cash was intended is self-evident, and is in accord with our rulings on agreements containing like wording in *Whitty's Trust Estate,* 316 Pa. 551, 175 A. 871, and *Topham v. Potter Title & Trust Co.,* 324 Pa. 140, 188 A. 299, as appears from the records in those cases. The use in the agreement in the present case of the term "guarantee" imported a primary obligation on the part of the trustee, not a secondary one, as the word is customarily used. This is apparent from the nature and context of the entire agreement and from the duty which the trustee assumed to invest and reinvest the aggregate corpus of the estate. Investments were contemplated as subject to change, in accordance with the exercise of a proper discretion on the part of the trustee. Hence there could be no technical guarantee of any particular investment, which might consist of a promise to pay on the part of the obligor of that security. The word as used by the parties was synonymous with a mere agree-

ment to pay the principal amount specified. In such case, the trustee's denial of liability on the ground that an undertaking of guarantee is *ultra vires* is without force, and is disposed of by the decision reached in *Roberts's Trust Estate*, 316 Pa. 545, 175 A. 869.

No other question raised on the record merits extended consideration. It appears that subsequent to the second statement furnished by the trustee to the settlor, the Doubleday-Hill Company defaulted in payment of the interest on its bonds and, upon the formation of a bondholders' protective committee, the settlor signed a letter of transmittal addressed to the trustee authorizing the deposit of his bonds with the committee pursuant to the deposit agreement. This letter or receipt, as it may be termed, throws no light on the respective positions which the parties seek to maintain, and certainly does not constitute an admission on the settlor's part that the bonds might be returned to him on termination of the trust instead of the cash principal which they represented. The bonds were still held in trust and the settlor in signing the letter did no more than serve the convenience of the trustee in securing the deposit of the bonds, an end no doubt advantageous to the latter. The ensuing correspondence between the parties is equally unenlightening, and contains nothing which would estop the settlor or forfeit his right to stand on the terms of his agreement.

Appellant trustee's contention that it should not be required to pay compounded interest, on the additional income received from time to time and reinvested, deserves only the comment that our construction of the agreement compels it to do no more than it agreed to do. It undertook to pay interest of five per cent on the principal corpus semiannually, which interest, unless diverted at the request of the settlor, should then be reinvested. Careful consideration of the agreement compels the inference that such interest, immediately on being paid as income or falling due, became part of the corpus

or "principal sum" on which interest thereafter accrued. This was the position which the trustee itself took in submitting its first statement to the settlor, adding interest on interest semiannually. Since the trustee received all the income from the assets in the trust estate, and had the use of the money for prompt reinvestment, it is in no position to complain of injustice when it is held to the performance of the obligations it assumed.

The decree is affirmed, at appellant's cost.